I'll take one more. Okay, we have a couple of consolidated cases. We'll refer to them as Zurich American Insurance Company versus Leasing Resources of America 2 at all. Mr. Cushing, whenever you're ready. Your Honors, Counsel, Mr. Hardin, Mr. Stanley, Mr. Cushing, Mr. Cushing, Mr. Hardin, Mr. Stanley, may it please the Court. Zurich wrote an ambiguous contract, and it seeks to avoid the results of that by, one, misrepresenting to this Court what the contract says, and, two, asking you to ignore other terms that conflict with Zurich's theory but that exist in the contract documents. Tell me what's ambiguous about this statement in the contract, which seems to me to control the outcome of this case. The policy says all named insurers are jointly and severally liable for the deductibles. What is ambiguous about that? Yes, sir. I have the document here, if it would help the Court. Just tell me what's ambiguous about that. Very good. What's ambiguous about that, number one, is that it comes in a section of the contract that says your duties, and the only you that can be your on that two-page piece of paper that Zurich relies upon, the only party that can be you, is Leasing Resources of America. Named insured schedule names all insurers. It lists every one of them, correct? The named insured schedule lists the named insureds. There's another schedule that immediately follows it that lists all of the insureds, which is about 235 companies. So your argument is that the ambiguity is created because the one listed named insured on that endorsement is potentially jointly and severally liable with itself? Yes, Your Honor, and I can explain why that is. I know that sounds counterintuitive. Well, it is counterintuitive. And I think that's why we didn't prevail below. But counterintuitive though it may be, the language of the document is critical. And if I might say, with all due respect to the District Court, when the District Court described the other language in the contract that is confusing as clutter and distraction, I would respectfully state that the clutter and distraction  Let me ask you this question. It's a different way of getting at what Judge Dubina asked, and I think I'm where he is too, at least initially. Under your reading of the contract, what are all the named insureds jointly and severally liable for? That's not clear. No, no, you tell me. What the named insureds The language has to mean something. Okay. Even if you prevail, Yes. What are your clients jointly and severally liable for? My clients are not jointly and severally liable to reimburse for the deductible payments that are at issue in this case. Not my question. Yes, sir. What are your clients jointly and severally liable for under your reading of the policy language? My clients are not. Jointly and severally liable for anything. They're not, and I hear the incredulity in your voice. I'd like the opportunity to explain why I see it that way and why the facts determine it that way, if you'll endorse me. Of course. So in the, which, and again, I would tender to Mr. Robinson the document because it's relevant to see. Absent that, I'll just speak my way through it and count on the court to look at the document. The large deductible endorsement that Zurich relies upon says, Insuring Company Zurich, named Insured Leasing Resources of America. Immediately thereafter, it says, This deductible endorsement applies between you and us. There are only two parties on that document, Leasing Resource of America, not one of the defendants, and Zurich. It applies between you and us. And then critically it says, the next sentence, It does not affect or alter the rights of others under the policy. It applies between you, Zurich. Pardon me. It applies between you, Leasing Resource of America, and us, Zurich. It does not affect the rights of others under the policy. We are others under the policy. There was not just one policy. There were 21 policies. Was this endorsement attached to each policy? Yes, it was. So that means that each policy for Company X had an endorsement which only applied to Company Y and spoke of general joint and several liabilities. Correct. It doesn't make any sense. It doesn't. And we didn't write the contract. That's my point. It doesn't make any sense. And if I might, Your Honor. So what are your clients' liabilities? Forget joint and several liabilities. Sure. What are your clients liable for in terms of the deductible? In terms of the deductible reimbursement of the deductible payments that were advanced by Zurich. Up to what amount? $2 million. Why? No, I'm saying my clients are not liable for that. What are they liable for? At the outset? Yes, sir. I hear your question. I'm prepared to answer it. Your brief says nothing, as far as I could tell, about how you read the policy and what your clients are liable for. As I read your arguments, your clients have no liability whatsoever for deductibles. That's correct. Is that correct? My clients do not. The signatories to the policy. What sort of a policy did they buy? My clients engaged someone else to a – What policy did they buy? A workers' compensation policy. With no deductible requirement repayment? $2 million deductible requirement repayment. You just said they're not required to pay that. If I might, Your Honor, I hear where the court is, and I'd ask just for 20 seconds of indulgence to answer it in the way that I think is necessary. Included in this contract of insurance is another document called the specifications. It's part of the contract of insurance. The specifications, according to the Zurich witness whom I deposed, the specifications are the final binding document that reflected all negotiations in the workers' compensation policy. The specifications are part of the contract. The specifications say that the three signatories to the specifications document, Leasing Resources of America Incorporated, PEO Management Services Group, and SCI International are responsible, and the specifications deal with this specific instance. There was a trust fund, Your Honor, and members of the court, that was funded to pay the – to reimburse these deductible payments. Its maximum amount was up over $20 million. It was exhausted as Zurich spent money to reimburse for claims. In this complex, complicated, high-stakes insurance program and policy contract, Zurich created a document that said if the collateral trust, the trust fund to pay these claims, if it runs dry, then X, Y, and Z. This is how we're going to be paid back. And it says – and I have that document. It's another one that I would ask to attend to the court, but it's in the record, and it's quoted liberally in my brief. It says, We will recover the amount owed under each paid loss billing from the collateral trust. If the funds available under the collateral trust are insufficient to pay your paid loss billings or to secure your obligations to us, if the funds under the collateral trust are available for any reason, you remain obligated to pay us for the paid loss billings pursuant to the terms of this agreement. The you, of course, are the three signatories to the specifications document. It's a document that Zurich created. They drew – they required that those three parties sign that in order to issue the policy of insurance. This is in our briefs. Zurich is not left high and dry. Zurich is entitled to collect against those three signatories, and Zurich sued them. There was an arbitration in Illinois. I'm familiar with it. I got tattered. They got a judgment against Leasing Resources of America, Inc., against Staffing Concepts International, against PEO Management Services, Inc. Zurich has told the world that this is the document that controls, and we all know the specific controls over the general. Your Honor, Justice Dubina, I understand. Certainly, you look at that language and say, well, for heaven's sakes, they're on the hook. In the large deductible endorsement, they had that one 15-word sentence they want to draw our attention to. They asked the court to ignore the beginning of the document, which says this pertains between you and us and does not impact others under the policy. Zurich's not stupid. They said, listen, if the collateral trust runs dry, if that trust fund runs dry, where's our recourse? They drew this document. It's in conflict, and you'll see in a couple of the cases that are cited, for instance, Zurich v. Watts is a case which is cited in the briefs, where it says in the contract document, on the one hand, it seems to say that the named insureds are responsible to pay the payments that were at issue in that case. But there was another agreement, and that is called a PPA or an RRA. It's another supplemental agreement, just like our specifications, that spells out the detail. How do we calculate what's owed? To whom do we issue it? Under what circumstances are we entitled to issue it? And that court said what, respectfully, I believe this court should say, A, it says one thing in one place, it says another thing in another place, and it couldn't be clearer what is said in these specifications. It could not be clearer. And Zurich knows it's part of the contract. Did your client have any, or clients, have any individual responsibility as an entity to submit money to that trust fund? They did, indeed. Where did that responsibility come from if they're not responsible for any deductible payments? They're two different things, Your Honor. I don't think that one logically follows from the other. The PEOs, these employers whom I represent, had large numbers of people who needed coverage. They went to a central body, which was called PEO Management Services Incorporated, as an abbreviation, PMSG. PMSG negotiated on behalf of all these various companies. The agreement and the program was Zurich. There was an obligation to fund the trust fund. The various PEO companies, my clients, had an obligation to pay into that trust fund, to PMSG, their agents, so to speak, I beg your pardon, their agents, so to speak, who paid it to Zurich and had funded a trust fund in excess of $20 million. Where did that obligation come from? Really, it was an oral agreement between my clients, the PEO companies, and PMSG. That's crazy. It is, indeed. You're telling me this is complex, convoluted, difficult, high stakes, and you're telling me that these companies entered into an oral agreement to deposit $20 million or so orally into a trust fund. Well, Your Honor, that is incredulous almost. Notwithstanding the court's comment, what we have were the PEO companies that were owned by John Hardin, my client, and Henry Hardin, his brother. Henry Hardin had established one of his companies, PMSG, to conduct the negotiations with Zurich and to negotiate the insurance program and the insurance coverage. That was fully documented. It's, we've got, this is one of the 21 contracts with Zurich, okay, fully documented. Zurich documented each one of those with between 300 and 400 pages of documents. John and Henry Hardin looked at one another and said, okay, we'll have PMSG negotiate the insurance contract with Zurich. And then we will, through our various entities, fund the money. And there was a formula. It was based on how many employees they had, what the incomes were for each of these PEOs. So it was pro rata, broken out, and they paid in the money that was necessary to pay in monthly to fund the trust fund. It's what happened, Your Honor, incredulity or no. But we're not here. And so they did pay. And Zurich said, what do we do if that trust fund runs dry? And for Zurich to say before the district court and before this court that it can choose to move forward only on the 15 words that Justice Dubina points out to us and to ignore the other terms that are admittedly part of the contract, they sued on it. They've got many, many millions of dollars' worth of judgments on this contract. They acknowledge it's part of the deal. But they have one document that they rely upon where the 15 words help them. If you read the opening three, four, five sentences, it says it does not apply to anybody other than you and us, and the you and us are Zurich and Leasing Resources of America. They wrote it. We did not. And Zurich has not left high and dry. They have multi-million dollar judgments for precisely these same amounts that they're suing for in this case. And they got them, probably appropriately, against the signers of the specifications document, the document that they drew to cover these very circumstances. And the specific terms prevail over the general. We've taken you way over your time, but we want to give you your time for rebuttal. So we'll hear from Mr. Stanley. Thank you, Your Honors. And I believe Mr. Stanley will address the issues that pertain to his client specifically. I appreciate the court's inquiries. Thanks much. And the offer still stands for me to hand these documents up for your review. We have them. Thank you very much. Thank you, Your Honor. Stephen Stanley on behalf of GNS Leasing Group 6. Your Honor, I've adopted the first part. All of what Mr. Cushing had to say as far as ambiguity and who's the name of insurer. So I'm not going to get into all that. GNS's position that it was never a name of insurer, never agreed to any contract, never got involved in any contract. GNS purchased a shell corporation with no assets, no business, no employees, no anything, review of the records, no workers' compensation policy, no records of any invoices, no records of any billing for workers' compensation, no evidence of workers' compensation at all. And, Your Honor, what happened is— Did your claim, just to get the procedural history right in my mind, was the liability of your client determined after the first summary judgment order at trial or someplace in between? Because my recollection is that at the first summary judgment order, the district court said that it needed more information about the situation involving your client. And didn't resolve the liability issues at that point. Shortly after, Your Honor, it gave Zurich time to answer some specifics of our response. And it granted it against GNS as well. So there's another order after the first summary judgment order against your client on general liability? Yes, Your Honor. Okay, got it. So, besides the fact that we don't believe that GNS is named, GNS doesn't have the liability because it did not accept insurance coverage or benefits. Zurich argues that it was a name insured on the insured schedule, as Judge DiBino pointed out. Well, just assume that that's right, although we don't really agree with that, but just assuming that argument is right, that Zurich insists the court enforce the joint civil liability provision in this policy for the $2 million deductibles based on the general rule that name insureds who accept policy benefits are liable for policy premiums, that a name insured may be jointly in several liable under a policy by accepting coverage under the policy. And in their brief, Zurich cited Hartford Accident and Demony Company v. L&T, a first DCA case in Florida, 455 Southern 2nd, 1074, page 1076. Contrary to Zurich's argument, GNS did not accept coverage under the workers' compensation policy. Name insurance status alone is not sufficient to create a contractual obligation to pay premiums. An express contractual promise to pay is required. And in the brief, I cited Transportation Insurance Company v. Busy Beavers, Boulevard Centers, Inc., which is a, admittedly, a Southern District of Ohio federal case, but not an 11th Circuit case. But I submit that as persuasive, Judge, an express contractual promise to pay is required, and there wasn't any. GNS leasing or resources of America 5, Inc., its predecessor, did not enter into a workers' compensation policy contract with Zurich and made no express promise to pay Zurich. Zurich sent no bills to GNS and never broke out the amounts GNS would be liable to pay. GNS was not an active company. GNS did not have any workers' compensation claims. GNS did not have any employees to insure. GNS did not receive any benefit from the workers' compensation policy or its coverage, contrary to the assertions of Zurich. Zurich was never at risk for any claims from GNS. Zurich has failed to demonstrate otherwise. As such, GNS has no liability, joint and sole or otherwise, to Zurich for the lost billings. Thank you, Your Honor. Thank you very much. May it please the Court. I'm Julie Young, and I represent Zurich American Insurance Company. The appellants are trying to complicate what is a very simple issue. The district court saw past this. The district court found all of the appellants' arguments to be clutter and distraction. It did not negate their clear liability under the insurance policies. And the insurance policies, the crux of this case, really does come down to one sentence in those policies. And that's the sentence in the deductible endorsement that clearly states, in these exact words, that each named insured is jointly and severally liable for all deductible amounts under this policy. There is- That language may be controlling at the end of the day, but that endorsement certainly could have been written in a much more clear way. For example, in your brief, you say, oh, there was just space to put, you know, one insured at the very top. But that doesn't explain why you couldn't have put a different name for each endorsement that you tacked on to each individual policy. And that way, you would have had symmetry between the name insured on the endorsement and the word you and your and the definition of that word. It would have been much simpler. There are certainly other ways you could have written this policy. But what we have to look at is how the policy was written and whether the key provisions themselves are ambiguous. The particular sentence at issue is not ambiguous. It means just what it says, which is that each named insured is jointly and severally liable. It does beg the question of, you know, who is a named insured? But to answer that question, you go to a separate, stand-alone, one-page part of the policy, and that policy is called a named insured schedule. Again, it is exactly what it says it is, which is a schedule of named insureds. It lists all the named insureds, and it identifies the appellants on one or more of those policies at named insureds. If my colleagues don't mind, I'm curious what your response is to GNS's argument, that although it may be listed there, other state law provisions mean that it's not really liable. So GNS, at the time the policy was written, it was part of the same ownership as the other appellants. It was one gentleman who owned all of those companies. He took out the policy from Zurich, and he named all of those particular entities as named insureds. There's nothing in the record that would suggest that there was some mistake in putting GNS on that policy. It had a different name at the time, but the name eventually changed to GNS. It was the same corporation. You can scour this record, and you're never going to find anything that's going to say that that was an error, that was a mistake, or that Zurich put any entity on that page different from what was exactly requested. The other thing we don't see in any of the briefs is any law that says that, well, if you don't have any employees with a different policy, you can't take out insurance for that. That's not the law. We're not going to see anything, any of the cases that were presented to you, say that that was improper to somehow cover them by this policy. And they did, in fact, purchase coverage, and they got coverage. Turns out they didn't need it because they didn't need the policy. They didn't have any employees. But they asked for it, and Zurich gave it to them. If I were to take out auto insurance and then not drive my car for the year, well, that's on me. That's not in the insurance company. I bought that policy, and with that came policy obligations. And one of the policy obligations here is that each named insured is jointly and severally liable. Now, G&S has a new owner, and maybe they're not happy with that deal, but it doesn't change the deal that was struck and the obligations that they incurred for that coverage. So you're going to incur liability for somebody else's deductibles even though you did not trigger any coverage? That's exactly the case here with G&S. Does that make sense to you? It does, and it made sense at the time because one person, John Harden, owned all of those companies. And he decided to take out this one consolidated policy that would have all the named insured. But it wasn't one consolidated policy. As I understand it, there were 21 individual policy issues. There was. But for G&S, there's a particular policy, and it has G&S listed with other named insured. Could John Harden have said, you know, I want to do things differently? I want a separate, standalone G&S policy? Certainly he could have asked for that, and if there were no claims, then G&S would have no deductibles. But that's not the contract. That's not the deal that was struck. John Harden took several of his entities, including G&S, put them on a policy, and in doing so, G&S became responsible because it says each named insured is jointly and severally liable. Now, it made sense at the time, as I said, because John Harden owned all those companies. G&S's new owners aren't happy with that deal. But that doesn't change the deal, and it doesn't change the terms of the contract that Zurich agreed to with these appellants. Did G&S ever make any payments to Zurich? No, the payments would have come through a source. So Zurich wouldn't have been able to determine who was making the payment, whether it was just G&S or someone else. To my knowledge, I'm not aware of any payments that G&S in particular made. The premiums for the policy, however, were paid. All that we're talking about here are deductible obligations. I do believe it was a joint payment, but I don't believe that that's in the record. So what we have here at the end of the day, we take the named insured endorsement, because each named insured is jointly and severally liable. We look to the named insured schedule. That tells us the named insureds who are responsible under every policy, and that should be the end of the story. What about the words you and your? The words you and your, so a couple things about those. First, if we look at the sentence in the policy that creates joint and several liabilities, it doesn't contain the word you. It doesn't contain the word your. If we go to the named insured endorsement, also no reference to you or your. So it's our position that that's really a red herring issue, that those terms don't come into play in this dispute. Now, notably where they did come into play are in some of the cases that we heard from the commentators earlier, the lot case. I believe this would be there as well. Those cases are very different, because in those cases, the policies did not have the express words providing joint and several liabilities. And so because the courts didn't have the words joint and several liability in the policy, they had to look to terms like you and your and kind of go through a complicated analysis. And ultimately, they were looking for kind of these magic words that weren't there. Here, our policy has the magic words. It says joint and several liabilities, so we don't need to get into that extended discussion of you and your. The other thing I want to point out that hasn't come up today has to do with waiver. If the appellants thought that these policies were ambiguous, surely they would have mentioned it in response to Zurich's motion for summary judgment, which went to liability. If they didn't think that they had to pay because these policies were ambiguous, certainly we would be able to pull up their response to the summary judgment motion and find some argument about ambiguity. It's not there. It also isn't in the trial transcript. And so in those circumstances, although I'm just mentioning it now, it was actually the lead argument in our brief that we have a waiver here, that they've waived the ability to challenge those conditions. We don't think they're ambiguous. We think that's why they didn't bring it up. But they've waived the ability to do so. What was the argument that GNS made when the district court sort of tried to decide that matter separately and asked you to submit further information and other material? What were the issues that GS defended? I believe those issues centered around the stock purchase agreement. And so there was an issue about whether that stock purchase agreement could somehow extinguish the liability of the contract. And the judge found that that was not the case, that GNS, with changing the name of the company, didn't change the corporate entity itself, and that entity, although it had a new name, remained responsible for the obligation. What about the specifications that Mr. Cushing referred to? The specifications are contained in a separate agreement. I usually refer to that as a program agreement. And the program agreement, a couple things to know about that. The first is that none of the named insurers are parties to that agreement. And second, there's nothing in that agreement that negates the policy obligation. You can read every word of that agreement, and you're not going to see anywhere in there that says that it changes the joint and several liability under the policy. His suggestion is that that document is the document that indicates to whom Zurich is looking if the trust fund money is depleted. And that agreement doesn't list anybody except two or three entities. And so to the extent that Zurich can look to anybody for deductible amounts over and above the depleted trust fund, it has to go to the party in that agreement. What's wrong with that argument? So there's a few things wrong with the argument. The first is that that agreement dealt primarily with collateral and financing. So because Zurich pays these policies out from dollar one on all of the work complaints, it assumes a credit risk of getting reimbursed for those deductibles. So in compliance with Florida law, rather, we established a collateral arrangement. And so the program agreement provided a procedure by which we ensured post-collateral with Zurich. In a perfect world, all the collateral would be posted. We'd be able to draw down on this collateral, and there wouldn't be any deductibles due. But that's not what happened here. The collateral was insufficient. It wasn't replenished. And so we were not able to draw down on the deductibles. What set out the amount of the collateral? It was agreed to at the outset of the program between Zurich and the insurer. Orally as well? No. It's a written agreement. It's in the program agreement. But the program agreement in establishing those separate responsibilities for collateral, it doesn't negate the policy obligations. There's nothing in the program agreement that says that it's extinguishing the obligations under the policy. We do have co-obligors. And in this type of situation, and in compliance with it, we've said some pieces of this in our brief, we have a choice. We can pursue any one of co-obligors for these obligations. That's what joint and several liability is all about. It would be great if we could recover the collateral. We haven't been paid for that. We're not trying to get paid for the same deductible obligation twice, but we need to get paid once. And there's different people that we can pursue for that under different contracts. And in this case, we're dealing with the policy. We've sued only under the policy. And the provision provides that each name in Zurich is given in several liabilities. The program agreement stands separate in part from that and has to do with collateral obligations. That agreement set out the amount of the collateral that had to be deposited or posted, or it was a separate agreement besides the specifications document? So the specifications document comes in two parts. It has a cover agreement, which I believe has something in the name like deductible and retrospective rating agreement, and the specifications are part of that. If you look at that document as a whole, neither of which are the policy, they set out the amount of collateral required, and they also set out a procedure for adjusting amounts of the collateral so it could be increased based on differences. All of that is contained in those separate stand-alone documents and is not contained in the policy itself, which has different parties and sets forth different obligations under a key non-basic obligation. Was the large deductible endorsement attached to or made a part of each individual policy, each one of the 21? Yes, it was. So why didn't each one of those have the name of the company that had the policy on the endorsement? So the endorsement, the way that it's structured, again, it goes back to the named insured. It says each named insured is responsible. Then you go to the named insured schedule. I know that. But each one of them at the top had the same named insured. It wasn't all of the 21 companies. It just had leasing resources of America. Yes. Right? So why? I don't know the reason why. Is that a problem for you? It isn't a problem because there's different ways to do this. And what we have to do is look at how was it done here, and is it ambiguous? Is there more than one reasonable way to read this policy? And we look here, and there is only one reasonable construction. Yes, there are two pages you have to go to. You have to go to the deductible endorsement to see that each named insured is responsible, and then you've got to look at the schedule, and that will tell you the names of the named insureds.  But there's really only two different pieces of paper that you need to look at on that policy, two different provisions that will put it together and answer the question of who the named insureds are. I'm not worried about the two pieces of paper. I'm worried about what the two pieces of paper say. It's very odd. If you have an insurance policy for Company X to attach an endorsement in the name of Company Y and then to say the text of that endorsement, although the heading is Company Y, also applies to Company X, that's an odd way of doing things. I think I understand your question better now. Those named insureds are covered under the policy. So even though they're not the first entity and we couldn't fit them all in the box, each of those named insureds is, in fact, covered under the policy. And you can bet that if Zurich didn't pay their claims and Zurich didn't provide the coverage to them, this would be an entirely different lawsuit. But Zurich did provide the coverage for each of those named insureds on each policy where a named insured appears on the schedule. All right. Thank you very much, Ms. Jones. Thank you. Your Honor, I have in my notes that each time Zurich says clutter and distraction, we win because the clutter and distraction identified is clutter and distraction that was created by their confusing and ambiguous contracts. Number two, counsel, when she was addressing the issue about Mr. Stanley's client, she said, well, they may not be happy with the deal, but that doesn't change the deal. And that's exactly what we have with respect to Zurich. They wrote a specific document that pertains to what happens when the trust fund goes dry and it makes others liable. And it's not unfair. Clearly, there are cases that say that typically insurance contracts are contracts of adhesion. This is a highly sophisticated international company. They know what they're doing. They wrote the document the way they wrote it. I want to take issue with Ms. Young's comment that the specifications are not the policy. That's wrong. In the parlance of their industry, they say, well, here's the policy document. It's six pages. And then here are the amendments or the schedules, and there are another 150 pages. Actually, in this instance, it's about 320 pages. And then we have other documents that you can bet your bottom dollar we're going to enforce that pertain to this policy, and they're the program agreements. And you'll see, when you look at the specifications, it says that when it references the insurance policies that it is part of, it references WC4865795-01. And that is the master policy under which all the rest of these fall. So it's disingenuous, again, for Zurich to say that the specifications is not part of the policy. It is period, end of story. Yes, sir. Under your interpretation of all of the language, what meaning is left of the joint and several liability language? Great question. The meaning is, first of all, because the court has a difficult job with 350 pages of trying to harmonize them, right? I mean, that's a challenge. It does say the named insureds are jointly and severally liable. And then Zurich, after writing this document, the large deductible endorsement, writes the more detailed document that is the specifications that's going to be the overarching program that everybody has to adhere to. And in that one, there are three named insureds who signed it, PEO Management Services Group, Inc., Staffing Concepts International, Inc., and Leasing Resource of America, Inc. If we're going to harmonize these, they are the ones who are liable for the reimbursement of deductible payments that are made if the collateral trust runs dry. That's the one rational way to do it. PEO Management Services Group, Inc., and Staffing Concepts International, Inc., there were 21 policies. My clients were named on, if my memory serves, eight, maybe nine of them. The other 13 or so were companies owned by Henry Hardin. The verdicts came in. We appealed. Henry Hardin did not, so he is the owner of those other two, PEO Management Services, Inc., and Staffing Concepts International, Inc. They would have been named insureds on some of the other 21 policies that didn't come up on appeal. That's the rational harmonization. I think it's the only rational harmonization. I understand the challenges when you look at that one sentence in isolation. They insist the court look at that one sentence in isolation. The court is not permitted to look at one sentence in isolation. The court is required to look at all of the terms of the contract and expressly not isolate one to the exclusion of others, and there are terms that conflict here. The specifications with this large deductible endorsement and the large deductible endorsement states expressly that it does not affect or alter the rights of others under the policy, and others under the policy are my clients. They wrote it. They have to live with it. You've gone way over your time, but we appreciate the indulgence. I appreciate the indulgence, Your Honor. Thank you. Okay, we're going to take a 10-minute break, and then we'll come back for our last case. All rise. All right, this is our last case of the morning, 18-13.